**2019 BNH 002**      **Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.**
_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                      Bk. No. 18-10010-BAH
                                                            Chapter 7
Rami A. Morris,
            Debtor


Rami A. Morris,
            Plaintiff

v.                                                          Adv. No. 18-1035-BAH


Massachusetts Educational Financing Authority,
            Defendant


*Rami A. Morris*
*Windham, New Hampshire*
*Pro Se Plaintiff*

*Paul M. Colella, Esq.*
*Law Offices of Paul M. Colella*
*Winchester, Massachusetts*
*Attorney for Defendant*


## MEMORANDUM OPINION

### I.  INTRODUCTION

Rami Morris (the "Debtor") filed a complaint under 11 U.S.C. § 523(a)(8) seeking to

discharge his student loans.  He contends that the repayment of his student loans imposes an undue

hardship on him and his dependents.  The Massachusetts Educational Financing Authority

("MEFA") holds the notes and denies that payment of these debts imposes an undue hardship.

The Court held a trial on January 31, 2019, and took the matter under advisement.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

The Debtor is a married, forty-eight-year-old man with two children, an eight-year-old daughter and a fourteen-year-old son.  In 1995, he graduated with a bachelor's degree in accounting from American College in Greece.  In 1997, the Debtor and his wife married.  For the next thirteen years, the Debtor worked in Boston in the financial industry.  From 1998 to 1999, he worked as a bond analyst and portfolio accountant/administrator at State Street Bank.  From 1999 to 2006, he worked as a junior research analyst, an assistant portfolio manager, and a performance measurement manager at Mellon Financial.  From 2007 to 2010, he worked as a portfolio manager at State Street Global Advisors.  During this time, the Debtor decided to attend graduate school on a part-time basis in order to advance his career.

The Debtor borrowed money from MEFA as follows to fund his graduate studies:

| Promissory Note Date | Original Loan Amount | Fixed Interest Rate |
|---|---|---|
| February 20, 2007 | $19,354.84 | 6.99% |
| June 15, 2007 | $37,113.40 | 6.89% |
| August 5, 2007 | $16,494.85 | 6.89% |

The Debtor obtained a master's degree in business administration from Boston University School of Management in 2008.  He also attended the "Tuck Executive Program, Leadership and Strategic Impact" at the Tuck Business School in Hanover, New Hampshire, as well as the "Investment Strategies and Portfolio Management" program at the Wharton School of Finance in Philadelphia, Pennsylvania.  The dates of the Debtor's attendance at these two programs were not disclosed at trial.

The Debtor began repaying MEFA's loans on or about December 28, 2008.  The payment required for the February 2007 Loan was $194.23 per month for fifteen years.  The June and August 2007 loans were apparently consolidated (together, the "June/August 2007 Loan"), and the payment for the June/August 2007 Loan was $444.48 per month for twenty years.  The Debtor made consistent payments on his student loans from 2008 through 2010.

In 2010, the Debtor lost his job with State Street Global Advisors due to the financial recession.  The Debtor did not work for a lengthy period thereafter.[1]  The Debtor's wife has worked steadily as a school teacher in Massachusetts.  In 2011, the Debtor liquidated $142,753.00 from his 401(k) savings to cover his lost wages.  In 2012, the Debtor's wife liquidated $48,403.00 from her 403(b) savings.  In 2012, the Debtor decided to change careers and formed QUPIRON Technology, an early stage technology startup, which marketed and sold small educational robotic products to elementary schools.  The Debtor served as its president and chief executive officer. The business was ultimately unsuccessful, and it folded in 2013.  That same year the Debtor's wife liquidated another $13,511.00 from her 403(b) savings account.  Altogether, the Debtor and his wife liquidated $204,667.00 of their retirement savings between 2011 and 2013 in order to pay their household expenses, including making payments on the Debtor's student loans.

In 2013, the Debtor's wife was diagnosed with breast cancer.  Despite her illness, the Debtor's wife did not miss any time from her teaching job that year.

In August 2013, the Debtor requested and was granted modified payment terms on his student loans, starting that month.  Under the modified payment terms, the amounts due each month were reduced for a period of twenty-four months.[2]  The Debtor made the reduced payments

---

[1]  At trial, the Debtor's wife testified that the Debtor was taking care of the couple's young daughter during that time.

[2]  The payment on the February 2007 Loan was reduced from $194.23 to $44.88 for the first six months, to $97.77 for next six months, and to $101.29 for the last twelve months.  The payment on the June/August

from August 2013 until June 2014.  On June 24, 2014, the Debtor made his last payments to MEFA.

In total, between December 2008 and June 2014, the Debtor paid $44,903.93 to MEFA. He made seventy-one payments on the February 2007 Loan in the total amount of $13,790.33, and he made seventy payments on the June/August 2007 Loan in the total amount of $31,113.60.

In 2014, the Debtor and his wife decided to downsize and reduce their expenses.  They sold their home in April 2014, with the Debtor's wife buying a new one with lower monthly expenses a few months later in July 2014.  In addition, in 2014, the Debtor began working in the restaurant industry as a food runner, a server, and a line cook.  Between 2014 and December 2018, the Debtor worked at least thirteen restaurant jobs at places such as UNO Pizzeria & Grill, the 99 Restaurant, Bertucci's, the Olive Garden, Burton's Grill, Texas Roadhouse, and Del Frisco's Double Eagle Steakhouse.

Despite the Debtor obtaining employment in 2014, the Debtor's family still experienced financial difficulties in 2015 and 2016, as both the Debtor and his wife had cars repossessed in those years.  In addition, the Debtor experienced medical issues in 2016 and 2017.  In October 2016, he was diagnosed with colon cancer, which required emergency surgery to remove a tumor. The Debtor also underwent chemotherapy for a little more than three months from November 2016 to March 2017.  In 2017, the Debtor received financial assistance from various cancer foundations in an aggregate amount of $2,700.00.

The Debtor has tested positive for the MSH2 Lynch Syndrome mutation, which means he has a higher risk of developing certain cancers during his lifetime and must have an annual

---

2007 Loan was reduced from $444.48 to $112.26 for the first six months, to $224.52 for the next six months, and to $294.00 for the last twelve months.

THIS IS NOT USED

endoscopy and colonoscopy.  In addition, he has inflammatory arthritis and experiences stiffness

and pain in his joints.

The Debtor's and his wife's annual income and tax refunds have been as follows between

2014 and 2018:

| Year | Debtor's Income | Wife's Income[3] | Joint Income | Tax Refund |
|------|-----------------|------------------|--------------|------------|
| 2014 | Undisclosed | $85,200.94 | $94,349.00[4] | $7,574.00 |
| 2015 | Undisclosed | 90,098.14 | 82,113.00[4] | 7,395.00 |
| 2016 | $20,478.13[5] | 88,536.04 | 91,140.00[4] | 5,399.00 |
| 2017 | 29,851.96[5] | 90,688.91 | 97,228.00[4] | 4,731.00 |
| 2018 | 16,520.13+[6] | 92,678.98[7] | 109,199.11+[8] | N/A |

The Debtor is currently unemployed.  While he has medical issues as described above, they do not

prevent him from working.  He states "he will be whatever he has to be" to support himself, his

family, and his future.  He is actively looking at "everything."  Between December 13, 2016, and

---

[3]  The Debtor's wife's total compensation per year, according to the records of her employer.

[4]  The income figure from the Debtor's and his wife's federal income tax return for each relevant year.

[5]  The Debtor's income according to his W-2 statement for the relevant year.

[6]  The Debtor earned $14,247.85 working at the Texas Roadhouse between January 1, 2018, and June 2, 2018.  Ex. 111.  He voluntarily left that restaurant job because he was required to do line dancing, which he did not like to do, and to clean the floor, which he found difficult with his stiffness issues.  The Debtor also earned $2,272.28 working at the Bancroft Chophouse, LLC from June 4, 2018, to July 23, 2018.  He voluntarily left that job because he was not employed as a server, as promised, but rather as a server assistant.  And, as a result, he was not making as much money as he expected.  The Debtor then worked as a server at Del Frisco's in Boston for a two-to-three-month period in the fall of 2018; his income from that job was not disclosed during trial.  The Debtor testified that he left that job in December 2018 as he did not make enough money to cover his travel expenses from New Hampshire to Boston, i.e., his gas and parking expenses.

[7]  The Debtor's wife's bi-weekly paycheck dated December 28, 2018, reflects gross earnings of $3,488.23 and net earnings of $1,964.93, which translates into net earnings of $4,257.35 per month.  This monthly net earnings figure does not include the additional earnings of $1,985.00 she received during the year in the form of a stipend.

[8]  The approximate combined income of the Debtor and his wife for 2018.  The Debtor's wife's last pay stub for 2018 reflected gross income of $92,678.98.  Ex. 8.  The Debtor's income for 2018 was more than $16,520.13 as outlined in footnote 6.

January 2019, the Debtor has applied, without success, for more than one hundred jobs in positions ranging from sales representative to financial analyst and CEO to airport operations crew and corrections officer.

The Debtor filed a chapter 7 bankruptcy petition January 5, 2018.  The Debtor's monthly expenses according to his bankruptcy schedules and documentary trial evidence are as follows:

| Expenses | Schedule J | Exhibit 7 |
|---|---|---|
| Mortgage | $1,581.00 | $1,585.00 |
| Home Equity | 331.00 | 360.00 |
| Real Estate Taxes | 667.00 | 641.00 |
| House Insurance | 112.00 | 121.00 |
| Electricity | 628.00 | 443.00 |
| Water, sewer, garbage collection | 250.00 | |
| Heat Utility | | 250.00 |
| Telephone, cell phone, Internet, satellite, and cable services | 317.00 | 360.00 |
| Home maintenance, repair, and upkeep expenses | 500.00 | |
| Real property maintenance, repair, and upkeep expenses | 200.00 | |
| Grocery | 800.00 | 800.00 |
| Medical and dental expenses | 150.00 | 152.00 |
| Car payments for Vehicle 1/Honda Car Payment | 255.00 | 250.00 |
| Car payments for Vehicle 2 | 140.00 | |
| Car insurance | 60.00 | 180.00 |
| Transportation Costs. Includes gas, maintenance, bus or train fare | 500.00 | 400.00 |
| TD Credit Card | | 208.00 |
| Capital One Credit Card | | 203.00 |
| Bank of America Credit Card | | 200.00 |
| Citi Credit Card | | 150.00 |
| February 2007 Loan | | 194.23 |
| June/August 2007 Loan | | 444.48 |
| **Total** | $6,491.00 | $6,941.71 |

There are discrepancies between the two sets of expenses that were not addressed at trial, most notably the expenses in the categories of "water, sewer, garbage collection"; "home maintenance"; and "credit card bills."

In his bankruptcy schedules, the Debtor listed $107,460.68 in unsecured debt, including $73,016.92 in student loans.  As of the petition date, the Debtor owed the following amounts to MEFA:

| Promissory Note Date | Principal Due | Interest Due | Total Due |
|---|---|---|---|
| February 20, 2007 | $17,388.21 | $1,034.73 | $18,422.94 |
| June 15, 2007 | $35,316.08 | $2,337.33 | $37,653.41 |
| August 5, 2007 | $15,888.98 | $1,051.59 | $16,940.57 |
| Totals | $68,593.27 | $4,423.65 | $73,016.92 |

The loans are not presently accruing interest.  The February 2007 Loan has a monthly payment of $194.23 with a remaining term of approximately 95 months.  The June/August 2007 Loan has a monthly payment of $444.48 with a remaining term of approximately 123 months.

The Debtor received a discharge of his non-student loan debt on April 4, 2018.  The Debtor testified that his household credit card debt exceeded $41,000.00 as of January 24, 2019; these accounts are all in the Debtor's wife's name.  In addition, the couple has borrowed $6,600.00 from the wife's parents, which needs to be repaid.  The Debtor further testified that his vehicle stopped running shortly before trial.  When necessary, the Debtor has been renting a car to get around.  Lastly, the Debtor testified that in order to maintain an income of $18,000.00 a year in retirement he will need save $325,000.00 by the age of sixty-six.  He currently has no retirement savings or savings of any kind.

## III. DISCUSSION

A debtor cannot discharge his or her student loans "unless excepting such debt from discharge … would impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. § 523(a)(8); see Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010).  The question is not whether payment of a debtor's student loans constitutes a hardship but instead whether that hardship is "undue."  Healey v. Mass. Higher Educ. (In re Healey), 161 B.R. 389, 393 (E.D. Mich. 1993).

"The creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8).  Once that showing is made, the burden shifts to the debtor to prove that excepting the student loan debt from discharge will cause the debtor and her dependents 'undue hardship.'"  Bronsdon, 435 B.R. at 796 (citing Smith v. Educ. Credit Mgmt. Corp. (In re Smith), 328 B.R. 605 (B.A.P. 1st Cir. 2005); Educ. Credit Mgmt. Corp. v. Savage (In re Savage), 311 B.R. 835 (B.A.P. 1st Cir. 2004)).

MEFA has met its initial burden outlined above as the Debtor does not dispute that the February 2007 Loan and the June/August 2007 Loan are the kind of student loans described in § 523(a)(8).[9]  Thus, the Debtor must establish by a preponderance of the evidence that paying his student loans will cause him and his dependents undue hardship.  See Grogan v. Garner, 498 U.S. 279, 287 (1991).  The United States Court of Appeals for the First Circuit has indicated that the "hardship alleged … must be undue and attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents."  TI Fed. Credit Union v.

---

[9]  Section 523(a)(8) applies to "an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or an obligation to repay funds received as an educational benefit, scholarship or stipend; or any other education loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual."  11 U.S.C. § 523(a)(8)(A)(i), (A)(ii), and (B).

DelBonis, 72 F.3d 921, 927 (1st Cir. 1995) (quoted in Paul v. Suffolk Univ. (In re Paul), 337 B.R.

730, 735 (Bankr. D. Mass. 2006)).  To prove undue hardship in this district, the Debtor must

satisfy a "totality of the circumstances" test.  Blanchard v. New Hampshire Higher Educ.

Assistance Found. (In re Blanchard), 2014 BNH 008, 15.  As explained by the Bankruptcy

Appellate Panel for the First Circuit:

> The totality of the circumstances analysis requires a debtor to prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts.  Courts should consider all relevant evidence—the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses.
> . . .
> The totality test looks to past, present, and future financial resources and necessary living expenses and whether, taken together with other factors, the debtor has the ability to repay while maintaining a minimal standard of living.

Bronsdon, 435 B.R. at 798 (citations and quotations omitted) (quoted in Blanchard, 2014 BNH

008, 14).

> "[D]istilled to its essence, the finding of undue hardship under § 523(a)(8) following the totality of the circumstances test rests on one basic question:  'Can the debtor now, and in the foreseeable near future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?'"  Bronsdon, 435 B.R. at 800 (quoting Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass. 2005)).  Whether a debtor has made a good faith effort to repay his or her student loans is also "a relevant factor in a totality of the circumstances inquiry."  Blanchard, 2014 BNH 008, 15.  While courts measure undue hardship "as of the trial date," it is "a forward-looking concept."  Bronsdon, 435 B.R. at 800 (citing Kelly, 312 B.R. at 204; Kopf v. United States Dep't of Educ. (In re Kopf), 245 B.R. 731, 744 (Bankr. D. Me. 2000)).

Abdinoor v. Navient Sols., Inc. (In re Abdinoor), 2015 BNH 006, 11.  A debtor's burden is high in

the student loan context as § 523(a)(8) "prioritizes the continued financial integrity of the federal

student loan programs over the debtor's ability to make a fresh start." Murphy v. Educ. Credit

Mgmt. Corp., 511 B.R. 1, 4 (D. Mass. 2014).

### A. Past, Present, and Reasonably Reliable Future Resources

The Debtor is a well-educated and articulate individual, as exemplified by his efforts

representing himself in this proceeding, with valuable employment experience and a capacity to

earn more money than he does now. See Ayele v. Educ. Credit Mgmt. Corp. (In re Ayele), 468

B.R. 24, 35 (Bankr. D. Mass. 2012). The Debtor holds an undergraduate degree in accounting, an

MBA, and certificates from attending business programs at the Tuck Business School and the

Wharton School of Finance. Between 1998 and 2010, the Debtor held a number of jobs in the

financial sector. While his salary information for those financial jobs was not offered into

evidence, the record reveals that the Debtor and his wife were able to purchase a home in 2007 for

$726,000.00. Between 2010 and 2014, however, the Debtor's income was nearly non-existent.

He collected unemployment for a period of time and made limited money running the technology

startup company. In 2014, the Debtor began working in the restaurant business where he earned a

regular income when he was employed. The evidence shows that the Debtor earned $20,478.13 in

2016, he earned $29,851.96 in 2017, and he earned $16,520.13 during the first seven months of

2018. The Debtor's wife is a school teacher in Massachusetts whose salary and stipend income

has steadily increased from $85,200.94 in 2014 to $92,678.98 in 2018.

Although the Debtor was unemployed as of the date of trial,[10] the Debtor has been

diligently looking for employment in a variety of fields, and the Court expects he will find

---

[10] The Court notes that "[u]nemployment or underemployment are insufficient per se to establish undue hardship." Paul, 337 B.R. at 737 (citations omitted); see also Murphy, 511 B.R. at 5 (finding debtor's "prolonged unemployment does not support a discharge"). "Financial adversity alone is insufficient to warrant a student loan discharge on the basis of undue hardship." Paul, 337 B.R. at 737.

employment.[11]  While the Debtor would prefer to obtain a job outside of the restaurant sector, and would presumably like to get a job that would use his advanced degree and training, the Debtor admitted at trial that restaurant jobs are plentiful and he likely could obtain another restaurant position.  If the Debtor were to obtain employment similar to what he has had during the past few years, he should be able to earn approximately $30,000.00 per year.  Accordingly, when combined with his wife's income, the Debtor's gross household income should exceed $120,000.00 per year.

On a net basis, the Debtor's wife's bi-weekly paycheck dated December 28, 2018 reflected earnings of $1,964.93, which translates into average net earnings of $4,257.35 per month.  This does not include the additional earnings of $1,985.00 she received during the year in the form of a stipend, which should result in additional monthly income of $165.42.  If the Debtor were to earn $30,000.00 on an annual basis, and if he were to net seventy-five percent of that income, the Debtor could contribute $22,500.00 on an annual basis ($1,875.00 on a monthly basis) to his family's support.

The Court notes further that the Debtor's income tax refunds are another source of reliable funds that may be used to support the Debtor and his family.  Paul, 337 B.R. at 737.  The Debtor's and his wife's income tax refunds have ranged from $4,731.00 to $7,574.00 between 2014 and 2017, resulting in additional funds being available in the average amount of $6,274.80 annually ($522.90 monthly).

Thus, taking all of these sources together, the Debtor's net household income should total $6,820.67 per month.[12]  Over time, this amount can be expected to increase due to salary raises.  And if the Debtor were able to obtain a job more closely aligned with his degrees, it would seem

---

[11]  The Debtor's "educational accomplishments and his persistent efforts in applying for hundreds of jobs attest to the likelihood that he will eventually obtain employment …"  Ayele, 468 B.R. at 35.

[12]  $4,257.35 + $165.42 + $1,875.00 + $522.90 = $6,820.67

11

likely that his income would be higher.  The Debtor testified that he would expect to work until age sixty-six, so for an additional eighteen years.

### B.  Reasonably Necessary Living Expenses

Under the totality of the circumstances test, "a debtor must show that [his] necessary and reasonable expenses leave [him] with too little to afford repayment."  Savage, 311 B.R. at 840.  Necessary living expenses are those that a debtor "could not cut from the budget and still maintain a minimal standard of living."  Id. at 841.

The Debtor's monthly expenses totaled $6,491.00 on his bankruptcy schedules and $6,941.71 as of the date of trial.  There were discrepancies between the two sets of expenses that were not explained.  For example, the Debtor's schedules reflect $700.00 in property maintenance expenses, which amounts were not reflected in the Debtor's expenses as presented at trial.  Thus, the Court could conclude that the $6,491.00 figure is overstated by $700.00, thus reducing the Debtor's expenses to $5,791.00 (not including the Debtor's student loan payments which were omitted from Schedule J).  In addition, the Debtor's expenses at trial reflect $761.00 in monthly credit card payments due on his wife's cards.  Further, some of the expense figures seemed high to the Court (e.g., electricity and telephone and cable services), but these expenses were not challenged by MEFA.

Overall, in the Court's view, the Debtor and his dependents should be able to maintain a minimal standard of living with monthly expenses totaling $6,100.00, not including the Debtor's student loan payments.  With average monthly net income of $6,820.67, the Debtor should be able to make the $194.23 payment on the February 2007 Loan and the $444.28 payment on the June/August 2007 Loan and still maintain a minimal standard of living.  Under the current payment terms, the February 2007 Loan would be paid in less than eight years and the

June/August 2007 Loan in a little more than ten years, thus many years before the end of the Debtor's working life.

### C. Other Unique Facts or Circumstances

"The third factor under the totality of the circumstances test is whether there are other relevant facts or circumstances 'unique to the case' that would prevent a debtor from maintaining a minimal standard of living." Abdinoor, 2015 BNH 006, 14.  The Debtor has not presented any unique facts or circumstances to suggest that he would not able to maintain a minimal standard of living if he were required to repay his student loans.  The Debtor did note that he and his wife have had marital difficulties, caused in large part by their financial situation.  He suggested that he may not be able to depend on his wife's income in the future.  However, the couple is not separated or going through a divorce.

The Debtor also indicated at trial that he would like to be able to save for retirement.  He specifically testified that he would need to save $325,000.00 by age sixty-six if he wanted to have $18,000.00 per year of retirement income.  While the Court acknowledges that requiring the Debtor to repay his student loans may preclude him from saving for retirement for some years, the Debtor's inability to afford making such retirement contributions will not diminish his present standard of living, and it does not constitute "undue hardship" within the meaning of the Bankruptcy Code.  Dolan v. Am. Student Assistance (In re Dolan), 256 B.R. 230, 239 (Bankr. D. Mass. 2000).  The Court does not find that the Debtor has demonstrated any unique or exceptional circumstances that would warrant the discharge of his student loans.

## IV.  CONCLUSION

The Court is not unsympathetic to the Debtor's financial difficulties, but notes that the

Debtor's situation is not unique.[13]  After weighing all of the evidence, the Court finds that the

Debtor has not satisfied his burden of establishing that paying his student loans would constitute

an undue hardship within the meaning of § 523(a)(8).  Accordingly, the Debtor's student loan debt

shall not be discharged.

Given the Debtor's current unemployment, however, the Court hopes that the Debtor and

MEFA can work together to devise a modified repayment plan, as was done prior to the Debtor's

bankruptcy filing, in order to alleviate some of the Debtor's present financial difficulties.  See

Dolan, 256 B.R. at 239 ("Despite the fact that the Court today declares the Debtor's student loans

non-dischargeable, the Court sincerely hopes the parties will work together in good faith to arrive

at re-payment plans that not only serves all involved but that also will not burden the Debtor for

---

[13]  See, e.g., Murphy, 511 B.R. 1 (holding that a highly educated sixty-three-year-old debtor who, while
currently unemployed and not having experienced any success in obtaining new employment, had worked
as a corporation's president, was not entitled to an "undue hardship" discharge of his $242,697.90 in
student loan debt, though the debtor's and his wife's current household income was nearly $4,000.00 less
than their monthly expenses, their home was "underwater," and the debtor had liquidated his $250,000.00
individual retirement account in order to cover household expenses, given that debtor had a history of high-
paying employment in the past and prospects of securing such employment in future, was in good health,
had a significant period of time remaining during which he could still work, and had recently experienced a
lessening of his financial obligations to his now-grown children); Ayele, 468 B.R. 24 (holding that a
chapter 7 debtor was not entitled to an "undue hardship" discharge of his student loan debt, given his
multiple degrees, lack of any condition that significantly interfered with his ability to work, and eligibility
for participation in loan repayment programs under which he would have no obligation to make any
payments on his roughly $30,000.00 in student loan debt while his present unemployment continued); Paul,
337 B.R. 730 (holding that a thirty-four-year-old, single mother of three, who had immigrated to the United
States from Haiti, and whose difficulties with the English language allegedly impacted her ability to obtain
employment, was not entitled to an "undue hardship" discharge of her more than $53,000.00 in student loan
debt, though the debtor's present gross income was only about $2,400.00 per month, where the debtor had
failed to use her best efforts to obtain a higher-paying job commensurate with her advanced education,
where the debtor had also failed to seek support from her children's fathers, where federal income tax
refunds that the debtor regularly received and a $25,000.00 settlement of tort claims that she possessed
provided her with additional funds that might be used for payment of her student loans, and where the
debtor also had the option of participating in an income contingent repayment plan, that would result in the
satisfaction of her student loan debt well within the debtor's remaining work life).

15

the remainder of his existence.").  This opinion constitutes the Court's findings of fact and

conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court

will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.


Date:   March 27, 2019                           /s/ Bruce A. Harwood
                                                 Bruce A. Harwood
                                                 Chief Bankruptcy Judge